The court had issued an order on the 23rd that wanted both parties to address the Cantrell issue, so I figured I would start there since that was the last directive. I think Cantrell and the specific call of the letter was, address what effect on sentencing, if any. It's our position that Cantrell does have some effect to the extent that footnote 4 makes plain that the analysis that is used is the plain and harmless error analysis. And in this case specifically, we have, there is no, and the government can never show any harm under a Cantrell analysis. Specifically, both in the opinion that then Judge Ray wrote, which was at 3.30 Fed sub second 1098, in which he went through his analysis, both under the guidelines and pre-Booker admittedly, and said in addition to that, that he planned on giving what he calls an alternate sentence. And then once again in the transcript and in the excerpts of record, I believe it's at page 494, the government specifically asks him, given what the history is and the state of the law, to give an alternate sentence, which he does say and reiterates twice, I would give the same. And that's what I'm doing and the term alternate is used. So under that analysis, even under the Cantrell, if you were to Venn diagram out the Cantrell way of analyzing this, whether or not the sentencing guidelines were in fact calculated correctly really does not matter, because ultimately there can be no harm. That having been said, I believe that the, it's not that different than the Manyweather opinion as well, which is cited in footnote 4. And in the Manyweather opinion, specifically the court, this court, found that the district court was not going to do anything different and had manifested that, admittedly in that case, on the basis of a couple of remands. In this case, however, the, what the government complains of is the, at least in the sentencing, is exactly what we complain about in the, what we believe is a fatal error at the admission of the trial, which is what was characterized by Mr. Ramsey in the trial court as 404B evidence, which are these uncharged transactions, which Judge Baird, prior to Judge Ray getting this case, had specifically struck from the indictment. Given the fact that she had struck it from the indictment, given the fact that the government then for the first time introduces or starts to introduce this evidence in the course of the trial, at the time the trial lawyer makes an objection, says that this is in the nature of 404B evidence, we have no discovery of this, how can we defend against this? It's admitted anyway. That, we believe, is prejudice to the defendant that can never be cured. The fact is that discovery was never provided on those so-called uncharged acts until after the conviction, until we took over post-conviction at our firm. In that instance, what Ms. Davis has been exposed to is a case in which she went to trial believing that she was charged with six instances of HUD fraud. She gets into the middle of trial, and all of a sudden there is wide-ranging in the middle of the trial, wide-ranging fraud alleged, which the trial lawyer, Mr. Ramsey, had absolutely no opportunity, number one, to prepare for, but didn't have at his disposal any discovery of. You then combine that with the admissions of what they call these, what I call an administrative letter, where there had been a letter from the agency saying that they're basically going to debar you for a year from practicing in this area or from doing what it is that loan agents do in this area. And that gets admitted. Kagan. What does this area mean? That is to say, what was the scope of the threat? The letter itself says that you're not going to be able to write under this program, this HUD program. So what ends up happening is that gets admitted in there, and the government's theory for the admission is, well, it's an adoptive admission. They sent the letter. I understand that. But I'm trying to figure out how broad the debarring was and, therefore, how likely it was that a reasonable person would have objected to that to say, you know, wait a minute, it didn't happen or whatever. Well, it actually has two ramifications. It's broad in the sense that it reflects the agency that they are claiming was defrauded here. So within the context of the trial, it's extremely broad. You're talking about HUD fraud. Here's a HUD debarment. From the standpoint of Ms. Davis, it's not that meaningful in her practice, because it only goes to specific types of loans. And if you're going to talk about a percentage, it's by no means the maturity of her loans that she's doing. Now, does that mean when you say it goes to only specific types of loans, does it not go to all loans processed through HUD? I do not believe that the HUD debarment goes to all loans that were through HUD. But even if it did, that still would not affect the majority of her loans. What do we know from the record in terms of how much of her business was loans being processed through HUD? My sense is actually if we're talking HUD in general rather than some subdivision of HUD, it was pretty high. Except that I believe as a percentage it was not the majority of her practice. That's all I can – or her business. But you don't have a number? I don't have a number, and I don't believe that's in a – unfortunately, I don't believe that's in a record anywhere. All I know is that the – that her position was no harm, no foul. I don't care. It's not a big business. It's not a big part of my business, so why am I going to – why am I going to dispute it? The fact is – I understand that point. On the other hand, the other – I think the countervailing argument is she's basically been accused of fraud by a government agency with whom she does some business. And if I had not engaged in fraud, if I thought that the charges were incorrect, I'd be pretty fast to say, you know what, that's a mistake. Well, I don't know. You know, it's an interesting business decision. Am I going to go out and am I going to hire a lawyer who's going to charge me X amount of dollars to engage in a protracted rather Byzantine process trying to get a government agency to reverse a debarment, which I believe was only for a short period of time? Or is the opportunity cost such that I don't care if I'm out of this element for a year on this particular program and I'm making much more money anyway on refis, which pay with the points and everything else? I understand the argument. Yeah. So, I mean, there's an opportunity cost. The fact is that that supposed curative instruction doesn't do it. I mean, that curative instruction says you can't use it to find the guilt, but it certainly doesn't give any guidance. And frankly, introducing that, I think, into the trial is the Achilles' heel and the fatal flaw of the case. When you combine it with the importation of all of this other material, which the trial lawyer is basically standing there with his hands tied behind his back, has no way to deal with it, and literally has no discovery of it. I mean, the classic expression of trial by ambush, this would be this is more trial by avalanche in terms of the number of boxes of materials. I can tell you that when we eventually asked for and got the discovery, it is multiple bankers' boxes of material. And he never even had the benefit of any of that. And I can also tell you that there is clearly disputes contained within those boxes as to whether or not what the government was alleging was true, which was part of, and we got into it, in terms of the sentencing hearing. So I know from at least personal experience post-trial that this was not something that was a, for a minute, a small issue or something that couldn't have been combated. But when you combine that with the letters, with the debarment, as I call it, I think that that's a fatal flaw. I also, and I, we did a section on it. Kennedy. Is there a request to the trial court to recess the trial for a certain period of time to enable them to conduct discovery? I believe what Mr. Ramsey did specifically was to first point to Judge Baird's previous order striking this information from the indictment, then to characterize it as 404B and say that he had not been given notice. Then I believe, when those were overruled, that he made a motion for a mistrial. Memory, if memory serves, I do not believe he asked for a continuance to get the discovery. I believe what he, the remedy that he wanted was the mistrial. Frankly, I believe that, and I've been in the position in other cases where I've received information mid-trial. It's, I would not ask in this case, if I place myself in Mr. Ramsey's shoes, for a continuance. You've already given your opening statement, generally in these cases. You've already decided on how you're going to cross-examine certain witnesses. Certainly, a continuance at this point, when you've already picked a jury and the die has been set, so to speak, as to how you're going to try the case, a continuance mid-trial, especially given the sheer volume of information that was then, that he would have had to digest, I don't see how anybody could have done it competently. My remedy always is in that situation, and I think any competent lawyer's remedy in that situation is to request the mistrial and to start over again so that you know whether or not this is the, how you're going to approach it, how you're going to deal with it, and maybe to make a, one of many motions in terms of excluding some of this and hope that the trial judge at that point understands the damage that's being done or the, how the lawyer is being caught by surprise. I think that it's clear that the lawyer in this case was reasonably relying on the fact that since Judge Baird had struck this information from the indictment, that he didn't have to deal with it. I think that if the government was going to introduce it, that they should have, under the rules of 404b, should have given notice of it. And by not giving notice and by dumping it, so to speak, in the middle of the trial, how do you, how do you remedy that other than by requesting a mistrial which was denied? I see that I've got some time left, but I'd like to, if I could, reserve that for after. Thank you. Good morning. Stephanie McCaffrey on behalf of the United States. The defendant in this case argues for a judgment of acquittal based on the fact that they claim that the government did not prove the element of causing a wire transmission in the furtherance of the scheme. In order to prove that element, the government has to show that the defendant knew or it was reasonably foreseeable to the defendant in the ordinary course of business here, mortgage lending, that wires would be used. After the government proves that element or that fact, the government must then show the interstate nexus of the wire transmission. It is the nature of the business, of the mortgage lending business, that interstate wires occur. Faxes and phones are used throughout the process. Banks that do business across the country are utilized in these mortgage lending transactions. And, in fact, in this case, the parties agree that two of the six transactions charged involved an out-of-state lender, out of Utah. The government proved in its case in chief that the use of wires was reasonably foreseeable to the government offered settlement statements showing wire fees. Governments Exhibit 5 and 23, which were discussed in the government's rebuttal argument, show wire fees used by RE Mortgage, the defendant's employer. Exhibit 11, also referenced in the rebuttal argument, show wire fees in connection with the loan. Various verifications of employment that were offered show the phone number of RE Mortgage and the phone number of the employer verifying the employment for the borrower. Now, with respect to the, throughout the trial, the government presented ample evidence from the real estate agents who brought these fraudulent loans to the defendant and the fraudulent document forgers who provided the false documents to the defendant for inclusion in the loans about the use of the phones and the use of the faxes throughout the lending process. In the rebuttal argument, the government did not argue that these wire fees referenced in the settlement statements were the wires specifically charged in the indictment. The government argued that the settlement statements showed that wires were sent by RE Mortgage, and as a result, the defendant knew or reasonably foresaw the use of wires in the mortgage lending business. Given the ample evidence presented to support a finding that the use of wires was reasonably foreseeable to the defendant, the government's comments during rebuttal argument were permissible inferences of the evidence. The defendant disputes or argues that the court erred in admitting these limited denial of participation letters. The district court found that it was an adoptive admission, and in its reply papers, the defendant argues that nothing was introduced concerning the circumstances surrounding February 2000 that would have shown that the defendant would have responded to these limited denial of participation letters. The government disagrees with that characterization of the evidence presented at trial. The defendant continuously engaged in FHA-insured loans from 1995 through 1999. The defendant was still in the loan business in February of 2000. There was no evidence that the defendant stopped doing FHA-insured loans, and, in fact, Raul Alter Morano, who was a real estate agent that testified during trial, stated that he did FHA loans through the defendant from 1998 through late 2002 or early 2003. Defense counsel argues that the limited denial of participation wouldn't have had an effect on the defendant's business. That is not the record in this case. The limited denial of participation letter told the defendant that she would be denied participation in all HUD loans, in all loans processed by HUD, for one year. Given those circumstances, the district court did not err in admitting the limited denial of participation letters as adoptive admission. Maybe you can give me the numbers that the other side had trouble coming up with. What percentage of her business were these loans processed through FHA or through HUD? Your Honor, we did not present evidence with respect to a percentage of the business that the defendant did with FHA loans as opposed to conventional loans. However, we did present the testimony of five real estate agents who did business with the defendant. And with those real estate agents, four of them testified that they did all FHA loans with the defendant, and one testified that she did one conventional and FHA-insured loans with the defendant. And given the testimony offered by the real estate agents and their relationships with the defendant, we believe that it shows that the defendant did do a substantial amount of business in FHA-insured loans. Enough business that a reasonable person would have said something in return in response to that letter. That's correct, Your Honor. Are there any collateral consequences to having a limited debarment from HUD? I'm trying to place in context how serious this was. Counsel for Ms. Davis has said, well, this was sort of a business decision that she just had to figure out whether she was going to spend her time writing other loans or responding to HUD if she didn't care about that part of the business when the rest of her business was going well. What are the consequences of getting those letters from HUD? The consequence of getting the letter from HUD is just being denied participation in the HUD program. So in the context of the defendant's business, she testified that she did FHA-insured loans and conventional loans. She would be limited to doing conventional loans only. Now, with respect to the defense counsel's characterization of the letter, the first letter, which is Exhibit 109, states this is the allegation. You should respond by letter. If we don't hear from you in 30 days, you will be debarred. Second letter, we have not heard from you. You are debarred. There's no discussion concerning legal process. The defendant didn't even choose to respond in any way to the HUD's request for information given their investigation of the submission of the two fraud claims. What's our standard of review to the district court's evidentiary ruling on this question? It's an abuse of discretion. With respect to the evidence of the other loans, the agent's testimony concerning the 80 other loans that the defendant was involved with, there is no dispute that the government introduced evidence of the scope of the scheme to defraud through various forms. The government did not limit its testimony that it offered through witnesses to the six loan transactions. Real estate agents testified about various loan transactions that they engaged in with the defendant that contained fraudulent information. The document forgers testified about numerous documents created at the defendant's request, fraudulent employment documents for inclusion in the loan, FHA-insured loans, and the testimony by the agent concerning the initiation of the government's investigation is just another piece of evidence of the scope of the scheme. The FBI agent testified that HUD referred RE Mortgage to the HUD Office of Inspector General, and the HUD Office of Inspector General, or OIG, and the FBI went out to investigate RE Mortgage. And in the course of that investigation, they found that the defendant had 80 loans in claims or default status. And that was more than any other RE Mortgage employee. In fact, the employee with the second-most loans in claims or default status had 26 as compared to 80. This testimony by the agent demonstrated the context of the case and the defendant's role in the scheme. The government never contended at trial that the 80 loans were fraudulent, nor would that be necessary for the testimony to be relevant to describe the initiation of the investigation and the focus on the defendant. In response to the defense's argument concerning Judge Baird's prior ruling, it is not clear from the record what Judge Baird based her ruling on, but what is clear is that the defense counsel filed a motion to strike surplusage, and that was the matter heard by Judge Baird. And Judge Baird struck the amount of fraudulent loans involved in the scheme from the indictment as surplusage. And it actually is surplusage because the government is not required to prove the amount of loans in the scheme to prove the wire fraud charges. Any ambiguity in Judge Baird's ruling was cleared up by Judge Ray. Judge Ray held that this evidence was not 404B evidence. It was inextricably intertwined. And when Judge Ray ruled as such, Judge Ray stated that his ruling was not inconsistent with Judge Baird's, and in the alternative, if it was, Judge Ray stated that he was not bound by Judge Baird's ruling pursuant to Luce v. the United States. Finally, in response to the Court's order to address Cantrell, the government requests a remand of the sentence under Fan Fan. Cantrell has a two-step process to evaluate whether any error occurred in the application of the Guidelines sentence, and if there was error, to remand the sentence. Only after this Court is satisfied that there is no error in the application of the Guidelines do you move on to reasonableness review. And the government submits that, like Fan Fan, the government has a right to resentence because the Court refused to base the sentence on judicial findings. The government at sentencing requested a 13-level increase for loss and a two-level increase for more than minimal planning, and that request was supported by the findings in the PSR. The district court found that such increases could not be supported by the jury finding. That basis or that finding by Judge Ray that he was constricted by the jury finding would be error, and the government, the Guideline calculation would therefore be incorrect, and the government requests that this Court remand the sentencing to the district court. What about the evidence in the record district court would have imposed the same sentence? The government does not believe, does not agree with that interpretation of the record. In fact, if you looked at the sentencing transcript as a whole, the district court, after finding that he was constrained by the jury findings, stated that what has not been taken into consideration by the calculated Guidelines sentencing range is the defendant's scope, magnitude, and a level of continued commitment to the scheme. Because of the defendant's involvement in the scheme, and because the scheme involves only those loans insured by FHA, it cannot be presumed that many more fraudulent loans were submitted by the defendant to other financial institutions. Therefore, the true scope of the defendant's conduct may never be known. The defendant argued for leniency at sentencing, arguing about the effect that any term of imprisonment may have on her daughter. And Judge Ray responded, why didn't she think of all this when she was committing the crimes? The district court then sentenced the defendant to six months' imprisonment, the maximum that it believed permissible based on the jury findings, and the court found that the sentence at the high end of the range was more than justified given the circumstances of the case. A particular note is the district court's order of restitution. The district court awarded restitution of $2,146,564, finding that to be the loss resulting, directly resulting from the defendant's offenses after finding that And with respect to the characterization of Judge Ray's specific colloquy concerning an alternate sentence, the government also suggests that the court focus on the actual transcript at government's excerpts of record, 494 to 495, because it is clear that the district court was referring to his order of restitution. Twice during that colloquy, when the government was requesting an alternate sentence, and when the district court was saying he would order the same thing, he kept saying, you didn't, you said that it didn't apply to restitution, didn't you? And I didn't think that restitution applied to the sentencing guidelines. If the court were to look at the excerpts of record and at that sentencing hearing transcript, it is clear that the district court was referring to restitution. The order of restitution, I'm sorry, give me, what was the rough figure? Did you say 5 million? 2.1 million. 2.1 million. And what is the significance of that figure? The significance of that figure is that is the figure that the district court found was the loss directly resulting from the defendant's offenses. And if, and meanwhile, for the sentencing, for the application of the sentencing guidelines, the district court felt that it could not find a loss based on the jury findings. Does a 2.1 million include, does that address restitution only for the crimes for which the jury found, or does it include other things? It includes relevant conduct for other properties. So it does include other properties that were not charged here. It does. So evidently the district court did believe that there were other things here that had not been accounted for in the guidelines. As interpreted through its award of restitution, yes. Well, the district judge is no longer with us. Yes, sir. Passed away, I think, about, well, within the year. What about the argument about bringing in all this evidence and big boxes and all that? I haven't heard a word about that. Your Honor, with respect to the evidence of the other loans, first of all, in the context of what was actually presented at trial, it was a series of two questions, how many loans did you find were in defaulted claims, and then the loss that HUD has suffered from those properties. The district, the government produced a loss calculation setting forth each of those properties two weeks before trial, and in the context of the discovery process with the government, the defendant had the right to review any underlying documents that are referenced in that loss calculation. Summary. Yes. And Judge Ray so found in his findings of fact and conclusions of law that the defendant had access to this discovery two weeks before trial. Are there no further questions?  Thank you. Thank you, Your Honor. If I could, I'll start with the sentencing issue first. The last sentence of the, or the last paragraph of the court's order at 330 F. Supp. 2nd, 1098. And thus the court will exercise its inherent authority to pronounce an alternative indeterminate sentence. The court requested that the probation officer prepare a revised pre-sentence report that reflects this ruling. The court then went on, at the very excerpt of record that counsel cites here on 494 and 495, in response to the government's question, and says, and they ask, well, we want you to give an alternative sentence. This idea that it's restitution, I would suggest any fair reading of that transcript suggests the otherwise. They're asking Judge Ray to give an alternative sentence, and he says repeatedly, twice, it would be the same. As far as this idea that Judge Ray felt that he was not bound by Judge Baird's previous ruling, and that's why it was okay, I would submit, besides the fact that I believe that there are constitutional issues as to one court of a concurrent jurisdiction overruling another court, that having been said, the fact still remains that you have a defendant who's caught in the crosshairs. It's not overruling. It's his case now. It is his case. But you've got a the problem is you've got a defense lawyer and a defendant who are sitting in the middle of trial, and the ruling has been changed. Well, that's fine. It's his case. But at a certain point, it's also the defendant's case, and the defendant's got a right to have his lawyer or her lawyer defend them and know what it is that they're going to bring in. They say, well, we asked one or two questions. Well, that was not the scope of it. The scope of it was in general. Now about the boxes, right? Yeah, the boxes. And the boxes of material that come. Under the evidence code, they're entitled to file a summary, and they'll say, here's the summary. Now, you know, here's the underlying material. When you get the summary, you then ask, well, let me see the underlying material. But what the officer was saying was that that wasn't done, and they just brought it in. Right. Well, they didn't bring it in. What they did was they knew that it was struck. They say that it was ambiguous with Judge Baird. It wasn't. I would suggest if you take a look at the excerpt of record, Judge Baird said, are you prepared to prove that up or something to that effect? And they said no. And that's what the lawyer is relying on. Two weeks before trial, they prepare a summary statement. I don't know if that's the case. I accept her word at that. But the ‑‑ it still remains that you've got a trial lawyer who is relying on a pretrial ruling saying that it is not going to come in. And there's no 404B notice. If they wanted to bring that in, they should have given notice under 404B. To prepare a summary document does not allow you to sidestep the rules. The rules are that you give notice under 404, which was not given. In addition to that, this idea of sending ‑‑ and, Judge Prager, you hit it on the head. Sending it back. Where are we going to send it back? To somebody ‑‑ to get a third judge to determine or divine what it was that Judge Wray had wanted to do? Judge Wray made it clear. He made it clear in his published opinion. He made it clear in questioning or in the response to questioning by the assistant United States attorney. And in terms of this restitution amount, at the same time, it could just as fairly be interpreted that the restitution amount, he felt, had to do with a different standard of proof than what was at the ‑‑ introduced into the trial. It still remains that all of that comes in midcourse or midtrial as opposed to before trial, giving notice as to what a defendant is entitled to under the rules, under 404 and under due process. And if there are no further questions, I'll submit it. Well, if the bottom line of that claim had been just limited to the evidence that was introduced in the particular charges that your client was facing, what would that amount come to? It would have been, I believe, the listed amount was $600,000 and change. And that was not the total loss amount. I believe that was the total loan amount. Total what? For the loans that were insured by HUD. Oh. Okay. I have to say, I'm frankly puzzled as to what Judge Wray did or didn't do, said or didn't say, meant or didn't mean during this sentencing dialogue. Because just before the language that you and the government's attorney are pointing to on 494 or 495, where he says, well, I did the same sentence then, when he talks about the length of incarceration as distinct from the amount of restitution, he evidences, it is the length of the sentence he thinks he's permitted to impose. He says, as per the court's order, blah-de-blah, zero to six months. This is now the court continuing. I'm on page 490. What has not been taken into consideration by the calculated guideline sentencing range is the defendant's scope, magnitude, and level of continued commitment to her scheme. Because of the length of the defendant's involvement in this scheme and because this case involves only those loans insured by FHA, it can be presumed that many more fraudulent loans were submitted by the defendant to other private financial institutions. Therefore, the true scope of the defendant's conduct may never be known. The assessment of the probation officer, therefore, that the sentence at the high range, end of the range, is indicated, namely six months, that is more than justified and will serve the need, da-da-da. So as I read that, Judge Ray is saying, you know, you're getting a break given the guidelines that I think I'm compelled to follow. Then we discuss restitution. Then the judge is asked by the government for an alternative sentence, at which point he says it would be the same then. And then there's more discussion of restitution. I'm, frankly, puzzled, given that I've got two things in this that look two different ways. Except, if I could give some context to that, it's at the time that we are arguing, I believe, rather forcefully, for a no-time sentence. And he is saying that he believes that six months is more than justified. We believed, obviously, that no time was justified, and that's what we were arguing for. And I believe that when read in that context, what he's saying is, look, Mr. Bieler, who was there arguing the sentencing, the six months is more than justified, given what has been presented to me. I don't think that you can read that out of context of the published opinion, which was the, exactly 30 days before, where he uses the same terminology, I'm going to, I plan on pronouncing an alternate sentence. And when the government, as you point out, asked for that alternate sentence, he says it would be the same. So, obviously, he knew and recognized in the published opinion the state of flux in the law at that point, and said that he was going to give an alternate. The government knew what they were asking and asked for an alternate, and he responds by saying that it's the same, and lets her stay out on appeal on top of it. The, I think the only, the government can't show under Cantrell, under many whether or anything else, that there has been plain error here, because he would have done the same. He had every opportunity to do something different and did not, and knew about it and had planned in on it, and we have a written coming attractions the month before. Were Judge Ray still alive to be sent back to, I would have very little hesitation about sending it back to him. But, obviously, we can't. Exactly right. Well, okay. Well, he said it's the same. So, you're telling us he was satisfied with the six months. I believe so. Pretty light sentence. Well, it depends on how you look at it. We get welfare mothers that forge a welfare check, somebody else's, and they go away for five years, you know. Yeah, I do white collar cases all the time where people get probation in less than a year, so. I mean, there is no rhyme or reason, I think, at some point to some of the sentences that one receives. So, unfortunately or fortunately, I guess. Yeah, okay. All right. We're going to take a little break. Can we take a break? Yeah. Well, we're going to take a short break, so. All rise.
judges: Pregerson, W. Fletcher, Bybee